# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

S.T.,
by his next friend SHONTE L. TAYLOR,

        Plaintiff,

v.

Civil Action No. 2:16cv717

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Shonte L. Taylor, proceeding *pro se*, brought this action on behalf of her minor son, S.T., pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act.

An order of reference dated March 8, 2017, assigned this matter to the undersigned. ECF No. 12. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is substituted for Carolyn W. Colvin as the defendant in this suit. *See* Fed. R. Civ. P. 25(d).

plaintiff's motion for summary judgment, ECF No. 15, be GRANTED in part and DENIED in part, and that the Commissioner's motion for summary judgment, ECF No. 18, be DENIED.

## I.  PROCEDURAL BACKGROUND

Shonte L. Taylor ("plaintiff") filed an application for SSI on October 18, 2013 on behalf of her son, S.T. ("claimant"), alleging he became disabled on June 1, 2012 due to attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD"). R. 11, 72, 134–43.[2]  The Commissioner denied plaintiff's claim on April 3, 2014 and, upon reconsideration, on June 18, 2014. R. 92–96, 102–10. At plaintiff's request, an Administrative Law Judge ("ALJ") heard the matter on February 22, 2016, and at that hearing received evidence from the claimant, plaintiff, and Eugene Leftwich, claimant's in-home counselor.[3] R. 29–71. On May 18, 2016, the ALJ denied plaintiff's claim, concluding that S.T. was not disabled from October 18, 2013 through the date of the decision. R. 8–24.

On September 1, 2016, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–3.[4]  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 416.1481. Having exhausted all administrative remedies, plaintiff filed a *pro se* complaint with this Court on December 20, 2016, alleging that the SSA improperly denied benefits to her

---

[2] Page citations are to the administrative record previously filed by the Commissioner.

[3] At the start of the hearing, plaintiff was advised about her rights to representation and informed the ALJ that she wished to proceed without an attorney. R. 31–32.

[4] The Appeals Council denied plaintiff's request for review on the basis that it was untimely filed. R. 2. Plaintiff claimed that she did not file in a timely manner because her mail was tampered with and she miscalculated the date the appeal was due. R. 4. The Appeals Council did not accept this as a valid reason for filing the request for review five days after the deadline. R. 2.

son. ECF No. 3.[5]  The Commissioner answered on February 27, 2017.  ECF No. 9.  In response

to the Court's order, the parties filed motions for summary judgment, on April 18 and May 19,

2017, respectively.  ECF Nos. 15, 18.  Plaintiff replied to the Commissioner's motion for

summary judgment on June 9, 2017.  ECF No. 22.[6]

## II.    RELEVANT FACTUAL BACKGROUND

### A.  *S.T.'s Background*

S.T. is a 13 year old boy, who was born in 2004.  R. 14.  He was a school age child

(between the ages of 6 and 12) in 2013, when the application was filed, and is now an adolescent

(between the ages of 12 and 18).  R. 14; *see* 20 C.F.R. § 416.926a(g)(2).  He was 8 years old on

June 1, 2012, the alleged onset date of disability.

---

[5] On January 3, 2017, plaintiff filed a document entitled "Amended Complaint," ECF No. 5, which the Court construed as a motion to file a supplemental complaint. ECF No. 7. Plaintiff's supplemental complaint alleged that the SSA failed to properly verify the identity of an individual who submitted changes to plaintiff's social security records, that the SSA has retaliated against plaintiff for bringing this lawsuit, and that the property manager of her apartment complex invaded her family's privacy. ECF No. 5. The Court denied plaintiff's motion to file a supplemental complaint on January 6, 2017. ECF No. 7. The Court found that plaintiff's property manager was not a proper party in the action, and instructed the plaintiff that, to the extent she would like to bring additional allegations against the SSA, she should file a true amended complaint in accordance with Federal Rule of Civil Procedure 15. *Id.* at 3. Plaintiff has not done so. Accordingly, the allegations contained in ECF No. 5 are not properly before the Court at this time.

[6] Plaintiff's reply to the Commissioner's summary judgment motion includes a prayer for relief, asking for back benefits for S.T., punitive damages, compensatory damages, aggravated damages, a formal apology from the SSA, administrative action taken against the employee who allegedly made changes to her records, and an effort by the SSA to ensure that others do not endure the same experience as plaintiff. ECF No. 22 at 9–10. Plaintiff also requests, in this reply, a jury trial. *Id.* at 10. Such relief is not appropriate at this stage. Even if it were, the appropriate mechanism through which to ask for such relief is the complaint.

## B. *Relevant Medical Records*

<u>Records of North Shore Pediatrics, LLC</u>

On June 7, 2013, Joseph Toland, M.D., evaluated S.T. for ADD/ADHD. R. 288. Dr. Toland noted that S.T. was generally well, but had many features of attention deficit disorder ("ADD"). R. 291. Dr. Toland discussed ADD with plaintiff and prescribed Ritalin. R. 291. At that evaluation, plaintiff indicated that S.T. was struggling with school, was poorly organized, but was well supported by his teachers, well connected with his peers, and was not hyperactive. R. 290. Dr. Toland noted that S.T.'s concerns about his absent father, the family's recent move to Arkansas, and his brother's diabetes likely played a role in his ADD. R. 291.

On July 16, 2013, S.T. was seen by Rebecca Myers, N.P., for a medication check. R. 285. Nurse Myers indicated that S.T. was struggling in school and barely passed third grade, that his mood was labile, that he was hyperactive, and that he had major family problems. R. 287. She noted that S.T. did not improve much while on medication. R. 287. However, S.T. appeared active, alert, and attentive. R. 287.

Nurse Myers performed another medication check on October 23, 2013. R. 282. S.T.'s school performance had improved; he was learning and doing well in school. R. 283. S.T.'s mother noted, however, that he was having issues at home after school once his medication wore off. R. 284. Nurse Myers suggested adding an afternoon dose of Ritalin to combat this problem. R. 284. S.T.'s diagnosis was updated to ADHD. R. 284.

On March 27, 2014, plaintiff and S.T. returned to Dr. Toland. R. 360. Dr. Toland noted that S.T.'s academic performance was poor and that he had a poor attention span, but no behavior problems. R. 362. He was active, alert, and attentive. R. 362. S.T.'s mother told Dr. Toland that S.T. was not doing well in third grade despite his Ritalin, but Dr. Toland noted that

4

his prescription had not been filled since October 2013 and it was unlikely that he was taking Ritalin at all. R. 363. Plaintiff stated to Dr. Toland that S.T. was more agitated at home, which Dr. Toland attributed in part to the fact that S.T.'s father had recently been released from prison and had not initiated contact. R. 363. Dr. Toland restarted S.T. on Ritalin. R. 363.

Plaintiff and S.T. saw Nurse Myers again on May 5, 2014. R. 357. She noted that S.T. had recently started Adderall and that it was working better for him than Ritalin did in the past, but that it was still wearing off by the time he got home from school. R. 357, 359. She noted that S.T. was previously on the honor roll, but that his grades had dropped that quarter. R. 359. She increased S.T.'s dosage of Adderall. R. 359.

On June 26, 2014, plaintiff and S.T. once again saw Dr. Toland. R. 353. Plaintiff reported no issue with S.T.'s school performance and reported that he was doing much better on Adderall. R. 355. She reported that he was not hyperactive, was able to initiate and complete tasks, was able to move on to the next task, was able to multitask, and was well connected with his peers. R. 355. Dr. Toland kept S.T. on Adderall through summer vacation because he believed that being more organized would reduce the criticism S.T. received and improve his well-being. R. 356.

On November 5, 2014, plaintiff and S.T. met with Dr. Toland. R. 349. Plaintiff told Dr. Toland that S.T.'s medication was not working and that S.T. was still struggling in school and failing. *Id.* She stated that a teacher recently informed her that the teacher could not tell that S.T. was on stimulant medication. R. 352. S.T. had also recently got into trouble for telling a little girl that he was going to "murder her." R. 352. Dr. Toland noted that S.T. may suffer from some degree of depression that may be exaggerated when his medication wears off in the evening. R. 352. He increased S.T.'s Adderall dosage. R. 352.

On December 4, 2014, plaintiff and S.T. followed up with Dr. Toland regarding S.T.'s ADHD. R. 348. Plaintiff reported that S.T. was doing a little better with the higher dosage of Adderall, but continued to look sad and appeared "to take little pleasure in life." R. 348. Dr. Toland advised plaintiff about the relationship between ADHD and depression. R. 348. He prescribed Prozac for S.T.'s depression. R. 348.

Other Medical Records

On May 21, 2015, Child Mental Health Community Rehabilitation Services evaluated S.T. R. 379–87. They noted that S.T.'s behavior had escalated and that he was a danger to others. R. 383. He had substantial anger issues, did not complete his homework, and was easily distracted and disorganized. R. 383. He exhibited difficulty in cognitive ability, had a deficit in social skills, and a deficit in dealing with authority. R. 383. He was given a global assessment of functioning ("GAF") score of 55.[7] R. 384. He met the criteria for therapeutic day treatment and intensive in-home services. R. 383.

On June 22, 2015, S.T. was evaluated by a licensed mental health practitioner with Brighter Futures Inc. R. 388–95. The practitioner indicated that S.T. had difficulty with behavioral and emotional regulation and exhibited physical and verbal aggression towards his

---

[7] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and indicates an overall assessment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR), 34 (4th ed. 2000). The following ranges are linked to the following symptomology: (1) 91–100—no symptoms, superior functioning; (2) 81–90—absent or minimal symptoms, good functioning; (3) 71–80—transient symptoms, no more than slight impairment in functioning; (4) 61–70—some mild symptoms, generally functioning pretty well; (5) 51–60—moderate symptoms and moderate functional difficulties; (6) 41–50—serious symptoms and serious functional impairments; and (7) 31–40—"some impairment in reality testing or communication ... and major impairment in several areas" of functioning. *Id.* The DSM-V abandoned the use of GAF scores as a diagnostic tool for characterizing patient functioning due to the questionable probative value of the scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

mother, siblings, and peers. R. 389. S.T. was also noted as having "psychotic episodes, particularly visual and auditory hallucinations." R. 389. S.T.'s problems were deemed "significant enough to warrant the highest level of service in the home." R. 389. S.T. was diagnosed with disruptive mood dysregulation disorder, major depressive disorder, unspecified anxiety disorder, and ADHD. R. 392. The report also indicated that S.T. had relational problems with his parents and siblings, educational problems, and lived in a high crime environment. R. 392. The report set goals for S.T. to "demonstrate the ability to express anger through appropriate verbalization and healthy physical outlets," "reduce irritability and depression while increasing normal social interaction," "demonstrate the ability to significantly reduce or eliminate hallucinations and to attain control over his disturbing thoughts, feelings, and impulses," and "demonstrate the ability to appropriately interact with age-level peers in a structured social environment." R. 395.

On February 17, 2016, Dr. Dannah Cheri' Garr, Ph.D., of Christian Psychotherapy Services, completed a psychological evaluation of S.T. R. 367–78. She noted that S.T.'s ability to maintain his attention was severely impaired. R. 369. She administered the Wechsler Intelligence Scale for Children, Fourth Edition, and S.T. scored a full-scale 85, which is within the low average range. R. 374–75. Dr. Garr administered the integrated visual and auditory continuous performance test, which determined that S.T. has a severely impaired ability to maintain his attention. R. 368–69. Dr. Garr opined that "[t]his likely indicates that the medications he is taking for his ADHD symptoms are not effective in helping him focus his attention. R. 369. Dr. Garr also administered two standardized tests that were completed by S.T.'s mother and were meant to determine if S.T. had Asperger's Syndrome. R. 373–74. The results of the first test indicated that the probability of S.T. having Asperger's was in the

moderate to very high range, while the second test indicated that the probability of S.T. having Asperger's was moderate to high. R. 373–74. Dr. Garr opined that S.T.'s moderate to high score on these tests was best explained by his anxiety. R. 375. Dr. Garr diagnosed S.T. with ADHD, ODD, and disruptive mood dysregulation disorder. R. 375.

## C. Records from Non-Medical Sources

### School Records

On January 12, 2012, the Student Support Team ("SST") for the Norfolk Public Schools met to discuss S.T.'s progress in the second grade. R. 181–83. The SST determined that, while S.T. had made significant progress, intervention was needed as he was still behind benchmarks. R. 181. The SST noted that he should continue to receive small group reading instruction with a communication skills specialist. R. 181. The SST held a follow-up meeting on April 5, 2012, noting that S.T. had made significant progress, but that he was failing math, did not turn in assignments, and failed a test. R. 175–76. S.T.'s teachers felt that he was very bright, but they were concerned with his organizational skills. R. 175. Additional reading instruction with a reading specialist was used in the past. R. 175. The SST recommended further action, such as a timer, the minimization of distractions during tests, frequent redirection, and rewards. R. 175.

The SST held another meeting on October 24, 2013, to discuss S.T.'s progress in third grade. R. 169–70. The SST noted that there were no behavioral concerns. R. 169. They also noted that S.T. was a good listener, followed directions, used his time wisely, turned in assignments on time, and was responsible and bright. R. 169–70. Further intervention was not recommended. R. 169–70. Plaintiff noted that she was happy that S.T. was being successful that year and that he made a connection with his teacher, but that he was still having difficulties at home completing his tasks. R. 170. He had environmental stressors at home. R. 170.

On February 18, 2014, S.T.'s teacher, Shemika Edwards, completed a teacher questionnaire. R. 194–201. Ms. Edwards indicated that she observed no problems in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving and manipulating objects, and caring for himself. R. 195–99. On March 20, 2014, Ms. Edwards responded to a request from the SSA and indicated that S.T. was placed in regular education with no special instruction. R. 317–18. She noted that S.T. had ADHD and received medication management at school. R. 317.

On December 11, 2014, S.T. was approved for a section 504 special education plan.[8] R. 324–332. S.T.'s teacher, Carrie Solano, stated that S.T. "displays a great ability to learn, comprehend, and apply all the skills in fourth grade." R. 324. However, she also noted that S.T. "has difficulty applying the skills during tests, independently, [and] has difficulty staying focused and engaged during independent work." R. 324. She had instructional concerns in reading comprehension, tests, and completing homework. R. 324. He received individual assistance in math and reading, and "quickly grasp[ed] concepts" during that individual assistance. R. 325. He was given re-teaching in English, and his teacher stated that he is able to "use these skills when he applies himself." R. 326. He was evaluated as having poor attention and concentration and an activity level that was excessively high or low, as well as fidgeting, squirming and being easily distracted. R. 327. Redirection, consistent monitoring, and re-

---

[8] A 504 plan is adopted pursuant to section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794, which provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A 504 plan differs in some respects from an individualized education plan ("IEP") under the Individuals with Disabilities in Education Act, codified at 20 U.S.C. §§ 1400, et seq. For example, a 504 plan has a broader definition of disability than an IEP, and also has fewer rigid requirements in its application.

engaging were used to target these problems. R. 327. His plan evaluation noted that he would become distracted and off task while concentrating, working, writing, reading, or doing math. R. 330. The plan called for small group testing accommodations, easy readers, independent breaks, cues to maintain his focus, and preferential seating. R. 333.

S.T. remained on this 504 plan as of the fifth grade. R. 396. The plan form, dated December 9, 2015, indicated that he did not like completing independent reading and writing assignments and did not do well on a recent standardized test. R. 398. It also noted that he was able to complete the work but was not always motivated to do so. R. 398.

On February 9, 2016, S.T.'s teacher, Beth Morin, completed a teacher's report form for S.T. R. 269–71. She noted that S.T. was at grade level in science and social studies, somewhat below grade level in math and writing, and far below grade level in reading. R. 269. She also noted that S.T. failed to carry out assigned tasks, could not concentrate or pay attention for long periods of time, and failed to finish things he started. R. 270–71. On February 10, 2016, S.T.'s teacher, Westley Madison, completed the same teacher's report form. R. 272–74. Mr. Madison indicated the same struggles as Ms. Morin in reading, math, science, social studies, and writing. R. 272. He indicated that S.T. had difficulty following directions, but had milder difficulties in finishing things, carrying out assigned tasks, and concentrating. R. 273–74.

### D. State Agency Opinion Evidence

On March 28, 2014, state agency psychologist, Howard Leizer, Ph.D., assessed S.T.'s medically determinable impairments and their severity. R. 75–77. Dr. Leizer opined that S.T. had no limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulation of objects, and health and

physical well-being. R. 75–76. Dr. Leizer stated that S.T. had a less than marked limitation in caring for himself, and determined that S.T. was not disabled. R. 76–77.

On June 12 and June 13, 2014, psychologist Patricia Bruner, Ph.D., and pediatrician Pamela Duff, M.D., assessed S.T.'s medically determinable impairments and their severity. R. 85–88. Drs. Bruner and Duff opined that S.T. had a less than marked limitation in attending and completing tasks and caring for himself, and no limitation in the other domains. R. 86–87. They likewise determined that S.T.'s impairments did not functionally equal a listed impairment and that S.T. was not disabled. R. 87–88.

### E. Hearing Testimony – February 22, 2016

At the hearing before the ALJ, S.T. testified that his best subject was math, where he was earning a "B" grade, but that generally he was not getting good grades at that time. R. 35. He testified that he plays four to five hours of videogames per day. R. 36. He stated that he has many siblings, two of which he lives with. R. 37–38. They bother him and he spends a lot of time by himself because he does not like being around people. R. 38–39. He has five or six friends that he spends time with at recess. R. 39. He gets dressed on his own, but he needs to be reminded to brush his teeth and get out of bed. R. 40.

His mother testified next. She testified that S.T. repeated the third grade, and that the school had attempted to retain him in fourth grade as well, but that she did not allow it. R. 44. She testified that he has a 504 plan, and has been treated for ADHD, ODD, and depression. R. 45–46. She stated that he has to be redirected a lot, does not do chores, and talks back. *Id.* She remarked that her son is distant, stays to himself, and is aggressive with other children. R. 47. He does not do his homework, gets horrible grades, and did well for only one quarter while on medication. R. 48–49. She testified that he has seen multiple therapists from Christian

11

Psychotherapy, and was undergoing in-home counseling. R. 48–51. He stays up all night because he cannot sleep, and then will not get up in the morning. R. 53. He only wants to play games, be on the phone, or watch television, and that he has a girlfriend that he talks to on the phone who is one of his classmates. R. 54. She testified that he is in regular education but that he has accommodations for testing and other work due to his concentration level. R. 55. She stated that he has problems learning, and was having a dispute with the school principal. R. 55–58. He does not spend time with classmates outside of school. R. 59. According to plaintiff, S.T. has behavioral problems, especially with female authority figures. R. 59–60.

Eugene Leftwich, in-home counselor for Brighter Futures, Inc., testified next as a character witness. R. 63. He stated that he has been seeing S.T. for approximately six months. R. 64. He testified that he was seeing S.T. three days a week, after school. R. 65. He was referred to S.T. due to S.T.'s results on the Virginia Clinical Assessment Program ("VICAP"), which indicated that S.T. qualified for in-home, outpatient, and family therapy services. R. 65–66. He opined that S.T. is severely depressed, which affects his social skills and home life. R. 67. He stated that it is extremely hard to motivate S.T. to do anything. R. 67.

## F. Documents Submitted After the ALJ Decision

Plaintiff has also submitted several medical records to the Court which postdate the SSA's decision to deny benefits. In her motion for summary judgment, plaintiff attaches a letter from Dr. Chevette Scott Alston, Psy.D., with Christian Psychotherapy Services. ECF No. 15-1. The letter references an appointment between S.T. and Dr. Alston on January 19, 2017. *Id.* Dr. Alston notes that, based on her review of Dr. Garr's report, S.T. endorsed a significant level of autistic sequelae, and that autism is frequently misdiagnosed as ODD. *Id.* Dr. Alston advised

Psychotherapy, and was undergoing in-home counseling. R. 48–51. He stays up all night because he cannot sleep, and then will not get up in the morning. R. 53. He only wants to play games, be on the phone, or watch television, and that he has a girlfriend that he talks to on the phone who is one of his classmates. R. 54. She testified that he is in regular education but that he has accommodations for testing and other work due to his concentration level. R. 55. She stated that he has problems learning, and was having a dispute with the school principal. R. 55–58. He does not spend time with classmates outside of school. R. 59. According to plaintiff, S.T. has behavioral problems, especially with female authority figures. R. 59–60.

Eugene Leftwich, in-home counselor for Brighter Futures, Inc., testified next as a character witness. R. 63. He stated that he has been seeing S.T. for approximately six months. R. 64. He testified that he was seeing S.T. three days a week, after school. R. 65. He was referred to S.T. due to S.T.'s results on the Virginia Clinical Assessment Program ("VICAP"), which indicated that S.T. qualified for in-home, outpatient, and family therapy services. R. 65–66. He opined that S.T. is severely depressed, which affects his social skills and home life. R. 67. He stated that it is extremely hard to motivate S.T. to do anything. R. 67.

### F. Documents Submitted After the ALJ Decision

Plaintiff has also submitted several medical records to the Court which postdate the SSA's decision to deny benefits. In her motion for summary judgment, plaintiff attaches a letter from Dr. Chevette Scott Alston, Psy.D., with Christian Psychotherapy Services. ECF No. 15-1. The letter references an appointment between S.T. and Dr. Alston on January 19, 2017. *Id.* Dr. Alston notes that, based on her review of Dr. Garr's report, S.T. endorsed a significant level of autistic sequelae, and that autism is frequently misdiagnosed as ODD. *Id.* Dr. Alston advised

that adjustments to S.T.'s medication were likely appropriate, and that his current medication was not fully effective. *Id.*

On April 20, 2017, plaintiff filed a letter, seemingly intended to be attached to her motion for summary judgment, from Stacey Mougl, PA-C. ECF No. 16. Dr. Mougl indicates that plaintiff, not S.T., is her patient, and that the plaintiff meets the definition of disability under the Americans with Disabilities Act. *Id.* The letter does not include any medical information related to S.T.

On May 2, 2017, plaintiff submitted several additional documents, requesting that they be attached as exhibits to her summary judgment motion. ECF No. 17. These documents relate to S.T.'s qualification for special education services for autism. *Id.* A notice of special education eligibility determination, dated April 27, 2017, noted that the Special Education Committee of the Norfolk Public Schools determined that S.T. had a disability, namely autism, within the meaning of the Individuals with Disabilities Education Act ("IDEA"). *Id.* at 2. The Wechsler Intelligence Scale for Children, Fifth Edition, was administered, and S.T. received a full-scale IQ score of 76, which falls within the borderline range. *Id.* at 8. Plaintiff also attached a report by school social worker Laura Gilmore, which was used to determine S.T.'s eligibility for special education. *Id.* at 15–18. Finally, plaintiff attached S.T.'s individual service plan from Compasión, LLC. *Id.* at 19–21. This plan indicates that S.T. experiences difficulty focusing for long periods of time, is disorganized, and requires several prompts and redirections to complete tasks. *Id.* at 19.

### III.    THE ALJ'S DECISION

To evaluate S.T.'s claim for supplemental security income for a child, the ALJ followed a three step analysis set forth in the SSA's regulations, *see* 20 C.F.R. § 416.924, by evaluating whether:   (1) S.T. was engaged in substantial gainful activity; (2) S.T. had a medically determinable impairment or combination of impairments that was severe; and (3) such impairment met, medically equaled, or functionally equaled an impairment in the listing of impairments ("listing"), described in 20 C.F.R. § 404, Subpart P, App. 1. R. 8–28. At step one, the ALJ found that S.T. had not engaged in substantial gainful activity since October 18, 2013, the date of his SSI application. R. 14. At step two, the ALJ determined that S.T.'s ADHD, ODD, and disruptive mood dysregulation disorder constituted severe impairments. *Id.* At step three, the ALJ found that S.T.'s impairments (and the combination thereof) neither met nor medically equaled the severity of a listing. R. 14–16. Further, by examining the six domains of functioning, the ALJ determined that the limitations resulting from S.T.'s impairments did not functionally equal the listed impairments either. R. 16–24. Accordingly, the ALJ concluded that S.T. was not disabled from the date of his SSI application, October 18, 2013, through the date of the ALJ's decision on May 18, 2016. R. 24.

### IV.    STANDARD OF REVIEW

In reviewing a decision denying benefits, the Court is limited to determining whether the record contains substantial evidence supporting the Commissioner's decision and the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance of evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V.    ANALYSIS

To be entitled to receive SSI benefits, a child must be disabled due to "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also* 20 C.F.R. § 416.906. SSA regulations set forth the three-step process described above for evaluating children's disability claims. 20 C.F.R. § 416.924(a).

In her motion for summary judgment, plaintiff states that she is overwhelmed by the process and asks this Court to "make the rightful decision[] in this claim." ECF No. 15 at 3. Mindful of its obligation to liberally construe a *pro se* plaintiff's brief, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam), the Court will assess the ALJ's decision to determine whether it contains any errors of law and is supported by substantial evidence in the record.

## A. Step One — S.T. has not engaged in substantial gainful activity.

It is undisputed that S.T., an adolescent child, has not engaged in substantial gainful activity, as described in 20 C.F.R. §§ 416.924(b), 416.972(a) and (b). The ALJ's finding at step one is supported by substantial evidence.

## B. Step Two — The ALJ did not err in determining S.T.'s severe impairments.

The second step in assessing SSI eligibility requires consideration of whether the claimant suffers from "a medically determinable impairment(s) that is severe," as opposed to a "slight abnormality or a combination" thereof causing "no more than minimal functional limitations." 20 C.F.R. § 416.924(c). SSA determines whether an impairment is "severe" by considering all relevant information of record, including information from medical and nonmedical sources, and examining how any alleged impairment limits and restricts a claimant's mental and physical health and functioning on a daily basis, in light of the claimant's age. 20 C.F.R. §§ 416.924a, 416.924b(a)(1).

The ALJ's finding that S.T.'s ADHD, ODD, and disruptive mood dysregulation disorder constitute severe impairments is supported by substantial evidence. R. 14. The plaintiff did not present any impairments to the ALJ that the ALJ considered to be non-severe. The plaintiff has recently produced information indicating that S.T. suffers from autism, but that information was not before the ALJ and will be discussed in more detail in Part V.D.

**C. Step Three — The ALJ did not support her decision that S.T.'s impairments do not meet or medically or functionally equal a listing with substantial evidence.**

A claimant may establish disability by showing that his impairments singly or in combination meet or medically or functionally equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B. This requires consideration of all of a claimant's impairments, including those that are considered non-severe. 20 C.F.R. §§ 416.911(b), 416.923, 416.924(a), 416.924a(b)(4), 416.926a(a) and (c). As noted in 20 C.F.R. § 416.925(a), Part B includes listings which describe "impairments that cause marked and severe functional limitations" that are disabling for children. A claimant's impairment or combination of impairments must satisfy "all the criteria" of that listing. 20 C.F.R. § 416.925(d); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (noting that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify"). A plaintiff bears the burden of showing the relevant criteria are met, and must present medical findings "at least equal in severity and duration to the criteria" for the most similar, listed impairment. 20 C.F.R. § 416.926(a); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

In this case, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled a listing. R. 14. Notably, the ALJ provided no immediate elaboration on this finding. "In evaluating a claimant's impairment, an ALJ must fully analyze whether a claimant's impairment meets or medically equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)). "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Cook*, 783 F.2d at 1173. However, *Cook* "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." *Russell v. Chater*, 60 F.3d 824,

1995 WL 417576, at *3 (4th Cir. 1995) (unpublished). If an ALJ's opinion as a whole provides substantial evidence to support the step-three decision, "such evidence may provide a basis for upholding the ALJ's determination." *Reavis v. Colvin*, 3:13cv149-HEH, 2014 WL 546106, at *20 (E.D. Va. Feb. 10, 2014) (citing *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011)); *see also Willis ex rel. J.C. v. Astrue*, No. 5:11cv71, 2012 WL 3240042, at *5–6 (W.D. Va. Aug. 7, 2012) (upholding the ALJ's decision as supported by substantial evidence even though he did not "identify the relevant listed impairments" because "the record clearly demonstrate[d] his consideration of the appropriate issues"); *Crockett v. Astrue*, No. 2:10cv64, 2011 WL 2148815, at *10 (W.D. Va. June 1, 2011) (upholding the ALJ's decision as supported by substantial evidence despite not explicitly stating the reasons that the claimant's impairment did not equal a listed impairment because "read as a whole, the ALJ's decision establishe[d] that the appropriate factors were considered").

The most relevant listing in this case would likely be 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11, which covers neurodevelopmental disorders for children ages 3 to 18, although, as stated, the ALJ does not reference any particular listing. In order to meet § 112.11, the child must meet A and B below:

> A. Medical documentation of the requirements of paragraph 1, 2, or 3:
>   1. One or both of the following:
>      a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
>      b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").
>   2. Significant difficulties learning and using academic skills; or
>   3. Recurrent motor movement or vocalization.
> AND
> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>   1. Understand, remember, or apply information.
>   2. Interact with others.

      3. Concentrate, persist, or maintain pace.

      4. Adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11 (internal citations omitted). Plaintiff, who bears

the burden of proving that a listing was met, does not reference any of the listings. Nor does

plaintiff specifically reference any records that would support a finding that this listing was met.

Nevertheless, the Court will endeavor to determine if substantial evidence supports the ALJ's

decision that S.T.'s impairments did not medically equal this listing.

      In analyzing whether the ALJ's opinion read as a whole supports the ALJ's decision, the

Court notes the similarities between the part B criteria listed above and the six domains of

functioning outlined below. Given these similarities, the Court will turn to the ALJ's

determination regarding functional equivalence to determine if the ALJ provided adequate

explanation. *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (stating that "the

ALJ need only review medical evidence once in his decision").

      If the claimant's impairment or combination of impairments does not meet or medically

equal a listing, the ALJ next considers whether they "functionally equal the listings." 20 C.F.R.

§ 416.926a(a). The ALJ evaluates functional equivalence by reviewing all the relevant

information in the claimant's case record to assess how the impairment affects the child's

functioning in six separate "domains." 20 C.F.R. § 416.926a(b). The six domains of functioning

are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and

relating with others; (4) moving about and manipulating objects; (5) caring for one's self; and (6)

health and physical well-being. 20 C.F.R. § 416.926a(b)(1). An impairment or combination

functionally equals a listing when it results in "marked"[9] limitations in two of these domains, or an "extreme"[10] limitation in one domain. 20 C.F.R. § 416.926a(a), (e)-(l). If a claimant establishes functional equivalence and duration, then disability benefits are awarded. 20 C.F.R. § 416.924(d)(1).

In addition to the information considered below, the ALJ also considered S.T.'s GAF score of 55 and accorded it moderate weight. R. 24, 384. She assigned moderate weight to the findings of the state agency medical consultants at disability determination services. R. 24, 75–90. While the ALJ did not discuss in great detail why she departed from the evaluation of the state agency consultants, any error would be harmless to S.T., as the ALJ's conclusions were more favorable to S.T. than were the state consultants' conclusions. Dr. Leizer opined that S.T. had no limitation in acquiring and using information, no limitation in interacting and relating with others, and a less than marked limitation in caring for himself. R. 75–76. Drs. Bruner and Duff came to the same conclusions. R. 86–87. As detailed below, the ALJ found that S.T. had some limitations, but less than marked, in acquiring and using information and in interacting and relating with others, and a marked limitation in caring for himself. R. 17–23. Aside from these more general statements, the ALJ considered the specific domains in more detail.

### 1. Acquiring and Using Information

The SSA is required to "consider how well [a claimant] acquire[s] or learn[s] information, and how well [a claimant] use[s] the information" he has learned. 20 C.F.R.

---

[9] A "marked limitation" arises when an impairment "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities" and such limitation is "'more than moderate,' but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2).

[10] An "extreme limitation" arises when an impairment "interferes very seriously with [a claimant's] ability to independently initiate, sustain, or complete activities" and such limitation is "'more than marked.'" 20 C.F.R. § 416.926a(e)(3).

§ 416.926a(g).[11] A school-age child, between the ages of 6 and 12, "should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). He should also be able to use these skills in an academic situation to demonstrate what he has learned, such as by reading and producing oral and written projects, by working in a group, by entering into class discussions, and by working through mathematical problems. *Id.* Outside of school, the child should be able to use these skills in daily living situations, such as by reading street signs, telling time, making change, exchanging information and ideas with others, asking questions, and expressing himself. *Id.*

An adolescent child, between the ages of 12 and 18, should continue to demonstrate what he has learned in academic assignments, such as through composition, classroom discussion, and laboratory experiments. 20 C.F.R. § 416.926a(g)(2)(v). He should be able to use what he has learned in daily living situations without assistance, such as by going to the store, using the library, and using public transportation. *Id.* The child should be able to comprehend and express both simple and complex ideas, and apply these skills in practical ways that will help him enter the workplace, such as by carrying out instructions, preparing a job application, or being interviewed by a potential employer. *Id.*

Against this backdrop, the ALJ found that S.T. has less than a marked limitation in this domain. R. 17. There is some conflicting evidence with respect to S.T.'s ability to acquire and use information, which the ALJ noted. In a February 18, 2014 questionnaire, S.T.'s teacher, Shemika Edwards, indicated that S.T. had no problems in the domain of acquiring and using

---

[11] The domain of acquiring and using information is similar to the § 112.11 B criteria of "understand, remember, or apply information."

information.[12] R. 195. The ALJ also relied on a March 20, 2014 report by Ms. Edwards noting that S.T. was in regular education with no special instruction and that he did not receive any therapy or counseling. R. 317–18. On the Wechsler intelligence test for children, administered by Christian Psychotherapy, S.T. scored in the low average range. R. 374–75. Other evidence exists in the record to suggest that S.T. has less than a marked limitation in this area. In S.T.'s § 504 plan evaluation in December 2014, S.T.'s teacher noted that S.T. "displays a great ability to learn, comprehend, and apply all the skills in the fourth grade." R. 324. He did, however, have "difficulty applying the skills during tests, independently." R. 324. She noted that he needed individual assistance during math and reading, but that "[d]uring individual assistance [S.T.] quickly grasps concepts." R. 325. She further noted that, while he needed some re-teaching in English, S.T. "can use these skills when he applies himself." R. 326.

The ALJ contrasted this information against the testimony, confirmed in the same March 2014 report referenced above, that S.T. repeated the third grade. R. 17, 317. Plaintiff testified that S.T.'s school suggested that S.T. also repeat the fourth grade, but plaintiff refused. R. 17, 44. Overall, the record supports the decision that S.T. has some limitations in acquiring and using information. However, the ALJ marshalled enough support from the record for her determination that those limitations were less than marked to satisfy the deferential substantial evidence test.

### 2. Attending and Completing Tasks

In this domain, the SSA considers a claimant's ability to focus and maintain attention and his ability to "begin, carry through, and finish [his] activities, including the pace at which" such

---

[12] Ms. Edwards indicated that, based on her observation, S.T. had no problems in any of the six domains. R. 195–200.

activities are performed and how changes to the same are handled. 20 C.F.R. § 416.926a(h).[13] A

healthy school-age child "should be able to focus [his] attention," follow instructions, organize

his school work, and complete assignments. 20 C.F.R. § 416.926a(h)(2)(iv). He should also be

able to focus on details and avoid careless mistakes avoided by others of his age, change his

activities or routines, and stay on task and in place when appropriate. *Id.* Finally, he should be

able to transition between events and activities and sustain his attention sufficiently to read by

himself, complete family chores, and participate in group sports. *Id.*

An adolescent child should be able to pay attention to increasingly longer presentations

and discussions, as well as maintain concentration while reading textbooks. 20 C.F.R.

§ 416.926a(h)(2)(v). He should be able to independently plan and complete long-range projects,

organize materials and plan his time, and maintain attention on a task for an extended period of

time without being unduly distracted by others or unduly distracting them. *Id.*

Once again, the ALJ determined that S.T. has less than a marked limitation in this

domain. On this point, however, the Court concludes that the ALJ did not support her decision

with substantial evidence. The ALJ's entire discussion of S.T.'s ability to attend and complete

tasks is as follows:

> Reports prepared at North Shore Pediatrics in October 2013 demonstrate that
> claimant is able to focus at school, but not at home. The February 2014 Teacher's
> Questionnaire similarly states that the child has no limitations in this area. The
> limited treatment records go on to reveal that claimant returned to North Shore
> Pediatrics in April 2014, where his mother complained that he was not doing well
> in the third grade, even though he was prescribed Ritalin.
>
> Treating physician, Dr. Joseph Toland, pointed out that this prescription was last
> filled in October of the preceding year. Dr. Toland, thus, concluded it was likely
> that the child was not taking his medication. In any event, records dated May

---

[13] The domain of attending and completing tasks is similar to the § 112.11 B criteria of
"concentrate, persist, or maintain pace."

2014 demonstrate that claimant is unable to initiate or complete tasks. They also state that he procrastinates and needs constant redirection.

Meanwhile, education records prepared at Norfolk Public Schools in December 2014 indicate that a 504 plan was implemented because claimant suffers ADHD. These education records state that he receives modified instructional materials. They also disclose that he requires assistance with English and he needs to learn test taking strategies.

The Administrative Law Judge finds that less than marked limitations are present in this domain.

R. 18–19 (internal citations omitted).

The first evidence the ALJ relied on is S.T.'s visit with Dr. Toland on October 23, 2013. R. 18, 282–85. The ALJ picked one line out of the report indicating that S.T. is able to focus at school but not at home. R. 18, 284. Problematically, the ALJ ignored the statement three lines below that, indicating that S.T. is "unable to initiate tasks; unable to complete tasks; [and] unable to move on to the next task." R. 284. Dr. Toland also noted on May 5, 2014 that S.T. is "unable to initiate tasks; unable to complete tasks; [and] unable to move on to the next task," and additionally noted that S.T. procrastinates and needs constant redirection.[14] R. 359. The ALJ did reference this record, but did not explain the weight given to it relative to the notation that S.T. can focus at school but not at home. This leaves the Court to guess at how the ALJ evaluated S.T.'s treatment record with Dr. Toland, as a whole, with respect to this domain.

Next, the ALJ once again took notice of Shemika Edwards' 2014 teacher's questionnaire stating that S.T. has no limitations in attending and completing tasks. R. 18, 196. However, there is conflicting evidence from S.T.'s teachers regarding his limitations in this domain. One of S.T.'s fifth grade teachers, Beth Morin, opined in 2016 that it was very true or often true that

---

[14] One month later, on June 26, 2014, Dr. Toland indicated that, "as reported by [the] patient," S.T. was "able to initiate tasks; able to complete tasks; able to move on to the next task;" and multi-task. R. 355. The ALJ, however, never cited this record.

S.T. failed to carry out assigned tasks, could not concentrate or pay attention for long periods of time, and failed to finish things he started. R. 270–71. Another of S.T.'s fifth grade teachers, Westley Madison, opined that it was somewhat or sometimes true that S.T. failed to carry out assigned tasks, could not concentrate or pay attention for long periods of time, and failed to finish things he started. R. 273–74. The ALJ did not reference either of those teachers' report forms, instead relying solely on the questionnaire filled out two years prior. Perhaps the ALJ could explain why Ms. Edwards' opinion is entitled to the greatest weight, but she never does so.

The ALJ also addressed S.T.'s section 504 plan, noting that it was implemented because S.T. suffers ADHD, that S.T. receives modified instructional materials, and that he requires assistance with English and needs to learn test-taking strategies. R. 19. This is the entirety of the ALJ's discussion of S.T.'s section 504 plan, and it is unclear to the Court how these facts support the ALJ's finding. Indeed, the plan indicates that S.T. "has difficulty staying focused and engaged during independent work," and the modified instructional materials are meant to help him focus. R. 324–25. Under the section labeled "behavior concerns," S.T.'s teacher, Carrie Solano, indicated that S.T. has "[p]oor attention and concentration," has an "[e]xcessively high/low activity level," "[f]idgets, squirms, or seems restless," and "[i]s easily distracted." R. 327. Redirection, consistent monitoring, and re-engaging were used. R. 327. Finally, it was noted that S.T. is substantially limited in the major life activity of concentrating, and that he "can become distracted and off task." R. 330. The ALJ did not discuss any of this information, or explain what weight, if any, such evidence was given.

Finally, the ALJ failed to address Dr. Garr's findings on February 17, 2016. Dr. Garr, rather than simply relying upon self-reported information from S.T. and his mother, independently put S.T. through a battery of diagnostic procedures to assess his condition and

limitations.[15]   R. 367–78.   One such test was the integrated visual and auditory continuous

performance test, which indicated that S.T.'s "ability to maintain his attention" is "[s]everely

[i]mpaired" and that "the medications he is taking for his ADHD symptoms are [likely] not

effective in helping him focus his attention." R. 368–69. The ALJ used Dr. Garr's findings with

respect to S.T.'s intelligence to support a finding of less than marked limitations in acquiring and

using information, R. 17, but ignored Dr. Garr's more negative findings with respect to S.T.'s

ability to focus.   Although the Court recognizes that the ALJ need not adopt any treatment

provider's findings *in toto*, the ALJ's failure to even address a critical finding by a treatment

provider who comprehensively and recently assessed S.T. cannot be overlooked.

The ALJ's ultimate failure is one of explanation. She referred to some evidence, some of

which indicates that S.T. actually has more limitations in this domain, but she never did more

than refer to it.[16]   She never explained how the evidence she cited led to her final conclusion.

*See Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) (unpublished) ("[I]t is not our role to

speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's

justifications that would perhaps find support in the record."); *Mascio v. Colvin*, 780 F.3d 632,

637 (4th Cir. 2015) ("Because we are left to guess about how the ALJ arrived at his conclusions

on [the claimant's] ability to perform relevant functions and indeed, remain uncertain as to what

the ALJ intended, remand is necessary."); *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)

---

[15] Dr. Garr administered ten such diagnostic tests, which assessed a variety of conditions, such as depression, intelligence, Aspergers, anxiety, trauma, general functioning, and more. R. 368.

[16] There is one potential exception to this statement. The ALJ referenced S.T.'s visit with Dr. Toland on April 23, 2014, where plaintiff complained that S.T. was not doing well in the third grade despite taking Ritalin. R. 18. The ALJ noted Dr. Toland's indication that S.T. was likely not taking Ritalin at that time. R. 19. To the extent that this represented the ALJ's explanation for not finding one of plaintiff's claims to be credible, she immediately undercut it in the next sentence, stating that "[i]n any event, records dated May 2014 demonstrate that claimant is unable to initiate or complete tasks." R. 19.

("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.") (internal citations omitted). The ALJ further ignored key evidence which contradicted the evidence she did cite by, for example, addressing one early teacher questionnaire but ignoring two later ones. This is not harmless error, because if S.T. has a marked or extreme limitation in attending and completing tasks, he is disabled under the regulations. Thus, remand on this basis is appropriate.

### 3. *Interacting and Relating with Others*

In this domain, the SSA considers a claimant's ability to "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others."[17] 20 C.F.R. § 416.926a(i). Healthy school-age children should be able to form durable friendships with one or more of their peers, to learn how to work with others on projects and problem solving, to better understand the points of view of others and accept differences, and to talk with, tell stories to, and speak with others of all ages in a manner that can be readily understood. 20 C.F.R. § 416.926a(i)(2)(iv).

An adolescent child should be able to initiate and develop friendships with their peers and relate appropriately to people of all ages, both individually and in groups. 20 C.F.R. § 416.926a(i)(2)(v). They should start to be able to solve conflicts, recognize the different social rules between age groups, intelligibly express their feelings, seek help or information, and describe events or tell stories in all kinds of environments with all kinds of people. *Id.*

---

[17] This domain is similar to the § 112.11 B criteria of "interact with others."

In this domain, the ALJ found that S.T. has a less than marked limitation. R. 20. Once again, the ALJ referenced Shemika Edwards' teacher questionnaire indicating that S.T. has no limitations in this domain. R. 20, 197. The ALJ referenced records from Dr. Toland that S.T. is well connected with his peers. R. 20, 284, 290, 355, 359. The ALJ referenced further records indicating that S.T. has no behavior problems at school and socializes well with peers. R. 20, 355. Testimony from the hearing further supports this finding. S.T. testified that he has five or six friends he spends time with at recess. R. 39. Plaintiff testified that there are some children S.T. spends time with at school, but not outside of school, and one female classmate whom he texts. R. 58–59.

There is some evidence in the record indicating limitations in this area. The ALJ took note of plaintiff's reports of aggressive behavior towards siblings and peers and general anger issues, including testimony that S.T. threatened a classmate and principal. R. 20, 58–59, 379–80. The ALJ also noted plaintiff's concern that S.T. often locks himself in his room and isolates himself. R. 20, 379. The ALJ explained that plaintiff "mainly attributes the child's anger to his father's sporadic involvement with him." R. 20, 391. Dr. Toland has stated the same and has indicated that his father's lack of involvement is clearly distressing to S.T. R. 363. While the record contains evidence of anger issues, there is enough evidence that S.T. can build friendships and is well connected with his peers to support the ALJ's determination that he has less than a marked limitation in this domain.

### 4. *Moving About and Manipulating Objects*

This domain considers how well a child moves his body from place to place and how the child moves and manipulates objects. 20 C.F.R. § 416.926a(j). In essence, this domain evaluates the child's gross and fine motor skills. *Id.* A school-age child should be able to move

at an efficient pace throughout his school, home, and neighborhood. 20 C.F.R. § 416.926a(j)(2)(iv). The child's increasing strength and coordination should increase his ability to enjoy a variety of physical activities, and his fine motor skills should enable him to use many kitchen and household tools independently. *Id.*

An adolescent child should be able to use his motor skills freely and easily to navigate his school, neighborhood and community. 20 C.F.R. § 416.926a(j)(2)(v). He should be able to participate in a full range of physical fitness activities, both individual and group, and should show mature skills in hand-eye coordination. *Id.* He should have the fine motor skills necessary to write efficiently or type on a keyboard. *Id.*

In this domain, the ALJ found that S.T. had no limitations. R. 21. Substantial evidence supports this determination. First, the ALJ noted that no allegations were made that the child had a limitation in this domain. R. 21. The ALJ further noted that no musculoskeletal abnormalities were observed during a physical examination on October 23, 2013. R. 21, 284. S.T. was observed to have "grossly normal movement of all extremities" on December 4, 2014. R. 21, 347. Shemika Edwards' questionnaire opined that S.T. also has no limitations in this area. R. 21, 198. Finally, the ALJ noted hearing testimony indicating that S.T. rides a bicycle and takes out the trash. R. 21. Accordingly, the ALJ's finding that S.T. has no limitations in moving about and manipulating objects is supported by substantial evidence.

### 5. *Caring for Self*

This domain considers how well a child can maintain a healthy emotional and physical state, including how well the child gets his physical and emotional wants and needs met in appropriate ways, how the child copes with stress and environmental changes, and whether the

child takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k).[18] A school-age child should be independent in day-to-day activities, such as in dressing or bathing himself, but may still need to be reminded to do these things occasionally. 20 C.F.R. § 416.926a(k)(2)(iv). The child should be able to identify those situations where he feels good about himself and those where he feels bad. *Id.* He should begin to develop an understanding of right and wrong and of acceptable and unacceptable behavior. *Id.* He should start to demonstrate consistent behavioral control, and avoid unsafe or unwise behavior. *Id.*

An adolescent should become increasingly independent in day-to-day activities and should begin to notice significant changes in his body's development. 20 C.F.R. § 416.926a(k)(2)(v). He should begin to discover appropriate ways to express feelings, think seriously about future plans, and about what he will do upon finishing school. *Id.* It is normal for an adolescent to experience confusion, anxiety, or worry about changes in his body development. *Id.*

In this domain, the ALJ found that S.T. did have a marked limitation. R. 23. The ALJ pointed to the Brighter Futures records which indicate that S.T. suffers episodes of mood disturbance and hallucinations. R. 23, 395. The ALJ also noted Eugene Leftwich's testimony that S.T. does not want to do anything. R. 23, 67. Dr. Toland has also indicated that S.T. is sad and "appears to take little pleasure in life." R. 348. S.T. testified that he has to be reminded to brush his teeth and get out of bad, and plaintiff has indicated the same. R. 40. The ALJ's decision that S.T. suffers from a marked limitation is supported by substantial evidence.

---

[18] This domain is similar to the § 112.11 B criteria of "adapt and manage oneself."

### 6. *Health and Physical Well-Being*

In this domain, the SSA considers the cumulative physical effects of the child's impairments on the child's health and functioning that were not considered in evaluating the child's motor skills. 20 C.F.R. § 416.926a(l). This domain does not address a child's abilities, but rather address how chronic illnesses, medication, or the need for recurrent treatment may impact a child's health and physical well-being. *Id.*

The ALJ found that S.T. has no limitation in this domain. R. 23. Substantial evidence supports this finding. As with moving about and manipulating objects, the ALJ noted that no allegation was made that S.T. was limited in this domain. *Id.* A physical examination conducted in October 2013 did not reveal abnormalities. R. 284. An examination in January 2014 indicated that S.T. fractured a toe, but there was no indication of lasting problems. R. 341. The ALJ also referenced reports prepared by Brighter Futures indicating that S.T. has never been hospitalized or involuntarily committed. R. 23–24, 392. Those records also state that S.T. has no restrictions on physical activities and has never been seen by a medical specialist. R. 392. The ALJ's decision is supported by substantial evidence.

### 7. *Summary of Functional Equivalence*

To summarize, the ALJ's findings that S.T. suffers from less than a marked limitation in using and acquiring information and less than a marked limitation in interacting with others is supported by substantial evidence. The ALJ's findings that S.T. suffers from no limitation in moving and manipulating objects and in physical wellbeing is supported by substantial evidence. The ALJ's findings that S.T. suffers from a marked limitation in caring for himself is also supported by substantial evidence.

However, the ALJ did not support, with substantial evidence, her finding that S.T. suffers from less than a marked limitation in attending and completing tasks. Because this was not harmless error, remand on this basis is appropriate.

### D. The new evidence submitted by the plaintiff does not warrant remand pursuant to sentence six of 42 U.S.C. § 405(g).

Plaintiff has submitted five documents that she wishes the Court to consider, which were not before either the ALJ or the Appeals Council below. ECF Nos. 15-1, 16, 17. A district court does not have the power to supplement the record developed before the SSA. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15 (1963)). The Court may, however, consider the evidence in the context of a sentence six remand. A district court may remand a case back to the SSA pursuant to either sentence four or sentence six of 42 U.S.C. § 405(g). Sentence six states:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). Under sentence six, the court "does not rule in any way as to the correctness of the administrative determination." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.* Remand is appropriate in such a situation, because, "[i]n determining whether the ALJ's decision was supported by substantial evidence, a district court cannot consider evidence which was not presented to the ALJ." *Womack v. Astrue*, No. 3:10cv165, 2010 WL 4874935, at *4 (Oct. 20, 2010) (citing *Smith*, 99 F.3d at 638 n.5). Sentence

six remand is appropriate where (1) the evidence is new, that is, neither cumulative nor duplicative of evidence submitted in a prior proceeding, *see Wilkins v. Sec'y., Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991); (2) the evidence is relevant to the determination of disability at the time the claimant filed her application and the Commissioner's decision might reasonably have been different had the new evidence been considered; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has made a general showing of the nature of the new evidence to the reviewing court, *see Miller v. Barnhart*, 64 F. App'x 858, 859–60 (4th Cir. 2003); *Campbell v. Astrue*, No. 2:11cv563, 2013 WL 1213057, at *3 (Mar. 1, 2013). The burden of proving these elements rests with the plaintiff. *Campbell*, 2013 WL 1213057 at *3.

Good cause exists for the plaintiff's failure to produce the new documents until after the ALJ's decision, because the documents did not exist until after the ALJ's decision. The plaintiff has also satisfied her burden to make a general showing of the new evidence to the Court. Thus, the Court turns to materiality by asking whether the material is relevant to the determination of disability during the time period considered by the ALJ and whether the Commissioner's decision might reasonably have been different had the new evidence been considered.

The Court will first dispense with the letter plaintiff submitted from her own psychologist regarding plaintiff's mental condition, ECF No. 16. This letter is not material to the question of whether the ALJ's decision as to S.T.'s disability claim is supported by substantial evidence.

Next, the Court turns to the letter from Dr. Alston. ECF No. 15-1. This letter is also not new evidence. In *Gadbois v. Colvin*, 2:15cv107, 2015 WL 10323034, at *8–9 (Dec. 28, 2015), this Court declined to remand pursuant to sentence six when faced with letters which provided a new diagnosis to symptoms that the claimant had already presented to the ALJ. Disability is not

determined by mere diagnosis, but by functional limitations caused by medically determinable impairments. 20 C.F.R. § 404.1521. "[T]he mere presence of a disease or medically determinable impairment does not automatically entitle a claimant to a disability period . . . under the Social Security Act." *Gotshaw v. Ribicoff*, 307 F.2d 840, 844 (4th Cir. 1962); *see also Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (holding that a disorder alone does not establish disability, "[t]here must be a showing of related functional loss").

In this case, Dr. Alston has not indicated any new symptoms that S.T. suffers from that may affect his functionality; rather, she relies on a psychological report by Dr. Garr, which was already presented to the ALJ, and opines that some of the symptoms that Dr. Garr noted regarding possible autism should have been included in Dr. Garr's final results. ECF No. 15-1.[19] The ALJ was aware of those symptoms when the ALJ made her decision. R. 17. Therefore, plaintiff has not adequately shown why Dr. Alston's letter would have reasonably changed the ALJ's decision.

The final group of documents presents a more difficult question. This includes the notice of special education eligibility determination, the sociocultural assessment, and the individual service plan. ECF No. 17. After careful consideration, the Court finds that these documents do not relate back to the adjudicated period, and thus do not require sentence six remand.

The plaintiff has not demonstrated that this evidence would have altered the decision of the ALJ. For one, as stated above, the fact that the Norfolk Public Schools found that S.T. suffered from autism is not enough to render the new evidence material. The bigger hurdle for

---

[19] Dr. Garr opined that the autistic sequelae indicated by Dr. Alston was likely a result of S.T.'s anxiety. R. 375.

34

the plaintiff, however, is that she cannot show that the new evidence relates to the period that was considered by the ALJ.

The findings in the additional documents are based on information obtained well after the ALJ's decision. For example, the documents reference classroom observation of S.T. that occurred after the ALJ's decision. ECF No. 17 at 8. The findings in the new report are also based substantially on information disclosed by the plaintiff. ECF No. 17 at 9–10. To the extent that the endorsed characteristics were present during the time period considered by the ALJ, the plaintiff could have disclosed those characteristics on any number of occasions, including during her hearing testimony. Other questionnaires were completed by S.T.'s teachers. *Id.* at 10. As a new school year had begun, these are new teachers making observations about S.T. that solely pertain to a later time period than the one before the ALJ, when the ALJ already had available to her questionnaires completed by teachers who taught S.T. during the relevant period. The plaintiff has not shown that this information relates back.

Evidence that concerns only the "subsequent deterioration of a previously non-disabling condition" is not considered to relate to the time period the ALJ considered. *Perrin v. Comm'r of Soc. Sec.*, No. 4:10cv141, 2011 WL 7053819, at *10 (E.D. Va. Dec. 16, 2011); *Fleshood v. Astrue*, No. 3:09cv833, 2010 WL 3893949, at *7–8 (E.D. Va. Sep. 8, 2010). There are some reasons to think that the new evidence represents deterioration. For example, S.T. was once again administered the Wechsler intelligence scale for children, and scored a full-scale score of 76, classified as in the borderline range. ECF No. 17 at 8. The 95% confidence interval was between 71 and 83. *Id.* This is notably worse than when S.T. took the test in February 2016. R. 374–75. There, S.T. achieved a full-scale score of 85, which is classified as low average. R. 375. The 95% confidence interval was between 83 and 93. R. 375. The Court cannot say that

35

an IQ test administered in 2017 reflects what the child's impairments were in 2016, especially when there is a contradictory IQ test from that time period. Further, the fact that S.T. was previously rejected for an IEP, and is now considered worthy of receiving one, also suggests that his condition has deteriorated.

Of course, this does not preclude the plaintiff from filing a new claim with the SSA based upon the new information. *See Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476 (4th Cir. 1999) ("'*[r]es judicata* bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994'") (quoting *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998)). The Court is recommending remand for the period previously adjudicated by the SSA, but if the plaintiff believes that S.T.'s condition has deteriorated since the ALJ's decision, she may file a new claim with the SSA for a subsequent period of disability and submit the additional evidence. *See Evans v. Astrue*, 2010 WL 451331, at *4 (E.D. Va. Feb. 8, 2010).

For these reasons, the new evidence submitted by the plaintiff does not justify a sentence six remand in this case.

## VI.     RECOMMENDATION

For the foregoing reasons, the Court recommends that plaintiff's motion for summary judgment, ECF No. 15, be GRANTED in part and DENIED in part, defendant's motion for summary judgment, ECF No. 18, be DENIED, the decision of the Commissioner be VACATED, and the case be REMANDED to the Commissioner for further proceedings consistent with this report and recommendation.

.

## VII.  REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2.  A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 21, 2017